**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and COOMER, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. Please refer to the Supreme Court of Georgia Judicial Emergency Order of March 14, 2020 for further information at (https://www.gaappeals.us/rules).

**June 4, 2020**

# In the Court of Appeals of Georgia

A20A0390. IRONWOOD CAPITAL PARTNERS, LLC et al v. JONES.

MILLER, Presiding Judge.

This appeal requires us to wade into the aftermath of an investigation into alleged mismanagement of investment properties that were held on behalf of AT&T's pension benefit plan trusts. Timbervest, LLC and four of its corporate officers, Gordon Jones, II, Joel Shapiro, Walter Boden, III, and Donald Zell, Jr., entered into a $6,000,000 settlement agreement with AT&T to resolve multiple claims of fraud and misuse of assets under the Employee Retirement Income Security Act of 1974 (ERISA). Jones subsequently filed the instant action, seeking a declaratory judgment that he is entitled to indemnification for any portion of the settlement for which he may be liable, whereas Timbervest, the three remaining officers, and many of its

related entities counterclaimed to get Jones to pay a pro rata share. After the trial court declared that Jones was entitled to indemnification, the defendants appealed, raising fifteen enumerations of error that challenge the trial court's declaratory judgment, the dismissal of most of their counterclaims, and the grant of summary judgment on Jones's claim for breach of contract based on the delayed payment of a dividend distribution.

We first conclude that the clear majority of this appeal is subject to the automatic bankruptcy stay, 11 U.S.C. § 362 (a) (1), because Shapiro has declared bankruptcy, and so we cannot reach the merits of most of the defendants' enumerations of error. We nevertheless conclude that we may properly address any arguments based on Jones's claim for breach of contract for failing to make a distribution and the defendants' counterclaim for breach of contract, and we agree with the trial court that summary judgment on these two claims was appropriate because the defendants' delay in making a distribution to Jones was unreasonable as a matter of law and because there is no evidence that Jones ever agreed or assented to the demand by the other officers that he was required to pay $1.5 million to join in the settlement. We therefore affirm the grant of summary judgment on these claims

2

and remand the remainder of this appeal for the trial court to enter a stay pending Shapiro's bankruptcy proceedings.

> Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law. On appeal, we review the grant or denial of summary judgment de novo, construing the evidence and all inferences in a light most favorable to the nonmoving party.

(Citation omitted.) *LeCroy v. Bragg*, 319 Ga. App. 884, 885 (1) (739 SE2d 1) (2013).

So viewed, the record indicates that Timbervest was a Georgia limited liability company which managed land and forestry assets related to timber and environmental and ecological remediation. During the relevant timeframe, Shapiro was the CEO of Timbervest, Boden was the CIO, Zell was the COO, and Jones was the president, and all four were considered "managers" of Timbervest under the operating agreement. Timbervest was wholly owned by Ironwood Capital Partners, LLC. Ironwood Capital Partners, LLC was owned by Shapiro (50% share), Boden (25% share), and Zell (25% share).[1] Jones, Shapiro, Boden, and Zell each also owned a 21.75% share of another company, TEP Investors, LLC ("TEPI").

---

[1] Jones had previously owned a 25% share of Ironwood Capital Partners, LLC, but he sold his share to Shapiro.

3

In May 2015, AT&T brought an action in federal court against Timbervest, Jones, Shapiro, Boden, and Zell, alleging multiple ERISA violations. AT&T alleged that it entered into an agreement (through its prior entity, BellSouth) with Timbervest for Timbervest to become an investment manager of AT&T's pension plans and that Timbervest specifically managed the portfolio of assets that were invested in timberland. During this time, Timbervest conducted a sale of a piece of investment land in Alabama (known as Tenneco Core) that was owned by the pension plan trusts. Instead of selling the Tenneco Core property on the open market at fair market value, Timbervest allegedly funneled the sale through a third-party controlled by Timbervest, leading the trusts to receive a price for the land that was millions of dollars below its market value, and allowing Timbervest and its related entities to pocket the difference. According to the complaint, Timbervest also sold the Tenneco Core property and a property in Kentucky using a real estate broker that was wholly owned by Boden, instead of using a neutral third-party broker, allowing Timbervest to effectively receive the substantial commission fees for each property sale.[2]

_____

[2] The Securities and Exchange Commission launched an investigation into Timbervest's practices and made an initial finding in 2014 that Timbervest and its officers all violated the federal Investment Advisers Act of 1940 (15 U. S. C. § 80b-1, et seq.) based on its handling of the Tenneco Core and the Kentucky property. Following an appeal and the settlement between AT&T and the Timbervest entities,

The parties reached a settlement agreement on December 18, 2015, wherein Timbervest, Shapiro, Zell, Jones, and Boden agreed to pay $6,000,000 to AT&T in exchange for a release of all claims. Timbervest paid AT&T the full amount with the assistance of loans made by Zell and Boden. Timbervest later paid back the loans to Zell and Boden in full.

Jones then filed the instant lawsuit against Ironwood Holdings, Ironwood Capital, Timbervest, TEPI, Shapiro, Boden, and Zell. In his complaint, Jones (1) sought a declaratory judgment against Timbervest, Ironwood, and the individual defendants that he was entitled to indemnification from Timbervest for the payment of his share of the AT&T settlement; (2) raised claims for breach of contract, conversion, and breach of fiduciary duties against TEPI, Shapiro, Boden, and Zell for the failure to make a dividend distribution to him in 2016; (3) raised a claim against Shapiro for the failure to pay on a promissory note; (4) raised a claim against Timbervest for conversion as to certain unreturned personal property from his office; and (5) sought attorney fees and costs. The defendants answered the complaint and raised ten counterclaims that included contribution, breach of contract, unjust

the SEC later dismissed its proceedings against the individual officers and ordered only that Timbervest cease and desist from committing or causing any further violations of the Advisers Act.

5

enrichment, quantum meruit, and fraud, which all generally sought to have Jones pay a $1.5 million pro rata share of the settlement. The defendants filed a motion for partial summary judgment, arguing that they were entitled to judgment as a matter of law on Jones's declaratory judgment claim and their counterclaims for contribution and unjust enrichment. Jones also filed a motion for partial summary judgment, arguing that he was entitled to judgment as a matter of law on five of his claims and eight of the counterclaims.

Following a hearing, the trial court granted in part and denied in part Jones's motion for partial summary judgment and denied the defendants' motion for partial summary judgment. The trial court first concluded that Jones was entitled to indemnification from Timbervest for his portion of the settlement payment under Timbervest's operating agreement. The trial court further concluded that Jones was entitled to summary judgment on the eight counterclaims that he challenged in his motion. The trial court also granted Jones summary judgment on his breach of contract claim for the delay in paying him the TEPI distribution, but it concluded that

6

factual questions precluded summary judgment on his claim against Shapiro to enforce the promissory note. The defendants then filed the instant appeal.[3]

1. As an initial matter, we must first address whether, and to what extent, this appeal is currently properly before us. During the pendency of this appeal, Shapiro filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Georgia.

The filing of a bankruptcy petition automatically operates as a stay of "the commencement or continuation . . . of a judicial . . . action or proceeding against the debtor." 11 U.S.C. § 362 (a) (1). "Any orders or judgments entered in violation of an automatic bankruptcy stay are void; they are deemed without effect and are rendered an absolute nullity." (Citation and punctuation omitted.) *Miller v. Lomax*, 333 Ga. App. 402, 404 (3) (773 SE2d 475) (2015). The appellate courts of this State are constitutionally required to dispose of every case at the term of court for which it is entered on the courts' dockets for hearing or at the next term of court, and so this

---

[3] Jones also filed a cross-appeal, seeking to challenge the trial court's denial of summary judgment on his claim against Shapiro to collect on the promissory note. As that claim is clearly subject to the automatic bankruptcy stay provisions, we have already separately remanded that appeal to the trial court to enter a stay pending Shapiro's bankruptcy proceedings.

Court does not have the power to stay a case. See Ga. Const. of 1983, Art. VI, Sec. IX, Para. II; *Boardman v. Brenninkmeijer*, 328 Ga. App. 882 (763 SE2d 267) (2014).

The majority of the parties' arguments on appeal concern Jones's claim for declaratory relief against all defendants regarding his right to be indemnified under Timbervest's LLC agreement. Because this claim for declaratory relief constitutes a "judicial . . . action or proceeding against the debtor," it is subject to the automatic stay. See *In re Johns-Manville Corp.*, 31 B. R. 965, 969-970 (II) (S.D.N.Y. 1983) (action for declaratory relief against the debtor was subject to the automatic stay). Furthermore, while the automatic stay provisions "do not ordinarily extend to a third party," *Payless Car Rental Sys., Inc. v. Elkik*, 306 Ga. App. 389, 389 n.1 (702 SE2d 697) (2010), we conclude that any action for declaratory relief against Shapiro is inextricably intertwined with the action for declaratory relief against the other co-defendants such that we cannot resolve any of the enumerations of error regarding the declaratory judgment with the automatic stay in place. The declaratory judgment claim is essentially indivisible, and there is nothing that is specific to Shapiro that we can separate out–either the trial court declares that Jones is eligible for indemnification or it does not. If we were to address the claim for declaratory relief against the remaining defendants, therefore, we would be completely and entirely

8

resolving the claim as to Shapiro as well. Compare *Gen. Motors Acceptance Corp. v. Yates Motor Co., Inc.*, 159 Ga. App. 215, 217-218 (2) (283 SE2d 74) (1981) (concluding that certain claims against the debtor's co-defendants were not so "inextricably interwoven" so as to warrant imposing the bankruptcy stay on claims against the non-debtor co-defendants). Relatedly, the trial court's dismissal of the defendants' counterclaims for contribution, unjust enrichment, quantum meruit, promissory estoppel, fraud, and breach of fiduciary duties is entirely dependent on its declaratory judgment, and so we also cannot resolve any enumerations of error regarding those claims with the automatic stay in place.

On the other hand, we conclude that the automatic stay does not prevent us from resolving the Appellants' two enumerations of error resulting from Jones's breach of contract claim for TEPI's alleged failure to make a monetary distribution to him in 2016, at least as to all non-Shapiro defendants. See *Johnson v. Regions Bank*, 301 Ga. App. 520, 520 n.1 (687 SE2d 906) (2009) (automatic bankruptcy stay did not apply to stay claims against debtor's co-defendants in action for damages alleging breach of contract and various torts). We also conclude that the automatic stay does not prevent us from resolving the appellants' challenge to the dismissal of their breach of contract counterclaim because that is a claim brought by the debtor,

9

not against the debtor, and resolution of that claim is not dependent on the trial court's declaratory judgment. See *Alpern v. Lieb*, 11 F. 3d 689, 690 (7th Cir. 1993) ("The appeal from the dismissal of the plaintiff's suit is not subject to the automatic stay, because the suit was filed by rather than against the debtor.") (citations omitted).

Accordingly, with the exception of Jones's claim for breach of contract for TEPI's alleged failure to make the 2016 distribution against all non-Shapiro defendants and the defendants' counterclaim for breach of contract, we remand this appeal to the trial court to enter a stay pending the resolution of Shapiro's bankruptcy proceedings. Upon the resolution of the bankruptcy proceedings or the bankruptcy court's lifting of the automatic stay, the defendants may re-institute the appeal by filing a new notice of appeal in the trial court within thirty days of the date of the entry of the order. See *DCA Architects v. American Bldg. Consultants*, 203 Ga. App. 598, 598-600 (1) (417 SE2d 386) (1992).

2. As for Jones's claim for breach of contract, the appellants argue that the trial court erred when it granted summary judgment to Jones on his claim for TEPI's failure to make a dividend distribution because the trial court erroneously concluded that the contract required the dividend payments to be made simultaneously to all TEPI members. We conclude that the defendants' delay in making the distribution to

10

Jones was unreasonable as a matter of law, and so summary judgment was properly entered in Jones's favor.

> On appeal, this Court's review of a trial court's construction of a contract is de novo. To begin our inquiry, we invoke the familiar framework of contractual construction, which involves three steps: [f]irst, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury. The cardinal rule of contract construction is to ascertain the intention of the parties. When the terms of a contract are clear and unambiguous, the reviewing court looks only to the contract itself to determine the parties' intent.

(Citations and punctuation omitted.) *Langley v. MP Spring Lake, LLC*, 307 Ga. 321, 323-324 (834 SE2d 800) (2019).

> TEPI's operating agreement provides that
>
> Distributable Cash shall be distributed to the Members at such times as may be determined by the Manager, and shall be distributed as follows . . . First, to repay any Member Loans made [to the company]; and

11

> Thereafter, the balance of Distributable Cash, to the Members pro rata in accordance with their then respective Percentage Interests.

In April 2016, TEPI made a distribution to its members, of which Jones was entitled to a payment of $521,179.74. TEPI's accounting records reflected that a payment was made to Jones, and TEPI reported to the requisite tax authorities that it made a distribution to Jones in that amount. In reality, TEPI did not pay that amount to Jones, and the money was instead returned to TEPI's operating account in September 2016. Shapiro, Boden, and Zell jointly decided to withhold Jones's distribution, and Shapiro testified that the decision was made because Jones "owed Timbervest or Ironwood a lot of money" from the AT&T settlement agreement. TEPI eventually paid Jones the distribution of $521,179.74 on June 25, 2018, during the pendency of the instant litigation.

As an initial matter, we note that the defendants are correct that TEPI's operating agreement does not specify a time as to when the dividend distributions shall occur, except that such distributions shall occur "at such time as may be determined by the Manager," nor does the agreement specify that the distributions to each member necessarily had to be made simultaneously. These facts alone do not end our inquiry, however. First, we note that TEPI's operating agreement contains a

clause specifying that "[t]ime is of the essence of this agreement, and to any payments, allocations and *distributions* specified under this agreement." (Emphasis supplied.) Second, Georgia law provides that "[i]f no definite time is stated for the performance of a contract, the presumption is that the parties intended that performance would be had within a reasonable time." (Citation omitted.) *Mansell 400 Assoc., L.P. v. Entex Information Svcs., Inc.*, 239 Ga. App. 477, 480 (4) (519 SE2d 46) (1999). "While it is the general rule that what is a reasonable time under the circumstances attending the transaction is a matter for determination by a jury, courts are authorized to determine that a delay in a party's performance is unreasonable as a matter of law." (Citation and punctuation omitted.) *DeMarco v. State Farm Mut. Auto. Ins. Co.*, 346 Ga. App. 882, 885 (1) (817 SE2d 360) (2018).

Here, TEPI and its managers waited over two years to provide Jones with a distribution payment that he had a contractual right to receive, when the contract contained an applicable "time is of the essence" clause and all the other members received their payments at or around the time the 2016 distribution was made. It appears from the record that the sole basis for the delay was the dispute over whether Jones was required to pay any portion of the AT&T settlement. Even if we assume that Jones owed a $1.5 million share of the settlement, however, at no point have the

13

defendants identified a contractual, statutory, or court-ordered garnishment right that would have allowed them to withhold payment of the TEPI dividend distribution to offset Jones's debt. This omission is particularly relevant when, as here, the debt in question was allegedly owed to Timbervest, which is a separate entity from TEPI, and there is no indication in the record that the profits that were source of TEPI's distribution were in any way linked to the alleged malfeasance by Timbervest. We note that there is also no evidence which could demonstrate that Jones breached any of the provisions of the TEPI operating agreement so as to be barred from receiving his distribution, nor is there evidence that he potentially agreed to the withholding to satisfy any debt or was mutually negotiating such an agreement. Absent a viable justification for withholding payment for two years, "[u]nder these particular facts and circumstances, the record shows that [the defendants] failed to perform within a reasonable period of time as a matter of law." See *DeMarco*, supra, 346 Ga. App. at 885 (1) (party's performance was unreasonably late as a matter of law when party waited three years to return a release form and negotiate a check); *Ferguson v. Bank of Dawson*, 57 Ga. App. 639, 640 (196 SE 195) (1938) (tender of stock six and a half months after the contract of sale was executed was an unreasonable time for

performance as a matter of law). We therefore affirm the trial court's grant of summary judgment on this claim.

3. The appellants also argue that the trial court erred in granting Jones interest, attorney fees, and the income tax that Jones paid on the 2016 distribution as damages for his breach of contract claim. The appellants, however, failed to support this enumeration with any arguments or citations that challenge the measure of damages specifically, and so we deem this enumeration abandoned. See Court of Appeals Rule 25 (c) (2) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned.").

4. The appellants further argue that the trial court erred in granting Jones summary judgment on their counterclaim for breach of contract. The appellants argue that the Timbervest officers reached an agreement about how they would each contribute to the settlement and that there is a genuine issue of material fact as to whether the parties mutually agreed that Jones would only be able to participate in the settlement agreement if he paid 25% of the settlement amount. We disagree.

> An answer to an offer will not amount to an acceptance, so as to result in a contract, unless it is unconditional and identical with the terms of the offer. To constitute a contract, the offer must be accepted unequivocally and without variance of any sort . . . In determining if

15

parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent. In making that determination, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement, and courts are free to consider such extrinsic evidence.

(Citations and punctuation omitted.) *Frickey v. Jones*, 280 Ga. 573, 574-575 (630 SE2d 374) (2006).

On October 28, 2015, during the settlement negotiations, Jones sent an e-mail to Shapiro noting his thoughts about how the officers and Timbervest would shoulder the cost of the settlement agreement. Jones made it clear that he did not think it would be fair for him to pay a pro rata share because he no longer owned a share of Ironwood Capital Partners and, by extension, Timbervest, and so he proposed to contribute around $1,000,000 through a mixture of payments, loans, and other provisions, subject to any indemnification rights. The next day, Jones sent another proposal wherein he would pay $1.2 million through through a mixture of payments, loans, and other provisions, subject to any indemnification rights.

16

On December 17, 2015, once the parties received a final draft of the settlement agreement, Jones made it clear that he did not want to sign a settlement agreement without a firm agreement between the four officers "about who is paying what." The officers held a meeting wherein they told Jones, "[Y]ou sign [the settlement agreement] and you pay your quarter share or you're not going to be a part" of the settlement. Jones left the meeting and informed the other officers that he would go home and think about the matter.

That night, Jones sent the following e-mail to Shapiro and Timbervest's general counsel (who also informed Zell and Boden of Jones's position ):

> For purposes of clarity, I wanted to reiterate the following. I am willing to sign the AT&T Settlement Agreement at the request of Timbervest, LLC in order to put to rest the claims currently pending by AT&T. As we have previously discussed on numerous occasions, I am not willing to contribute funds equal to a pro-rata share of each of the five defendants named in the AT&T lawsuit and am not agreeing to pay any specific amount of, or to be jointly and severally liable for, the settlement amount set forth in the AT&T Settlement Agreement. Any amount, if any, that I agree to contribute likely would be subject to terms similar to those communicated to you for the last couple of months. However, these previous communications have been for discussion purposes only and are in no manner binding on any person or party. In addition, by signing the Settlement Agreement, I am in no manner

17

> modifying or waiving any rights to indemnification . . . . Any binding terms on which I would be willing to contribute funds to the settlement or modify or waive any indemnification rights would have to be set forth in a written agreement signed by all parties.

The parties signed the settlement agreement the next day. The final settlement agreement between the Timbervest parties and AT&T did not include any specific provisions as to how the payments were to be divided among the Timbervest parties.

Upon reviewing this correspondence among the Timbervest officers, all of whom are sophisticated business officials, we discern no objective evidence demonstrating that all the officers ever reached a mutual agreement as to how they would divvy up the $6,000,000 payment, and we discern no objective evidence that Jones agreed to or accepted the other officers' demand that he pay $1.5 million as a prerequisite for joining the AT&T settlement. While Jones did eventually sign the settlement agreement, we find no arguably objective evidence that he agreed to be bound to contribute one-quarter of the settlement. As such, to the extent that the other officers made a demand of Jones, it "constituted [a mere offer,] and no binding agreement was formed." *Frickey*, supra, 280 Ga. at 576. Thus, because the pre-settlement discussions between the Timbervest officers did not result in any binding agreement as to how the $6,000,000 was to be paid, these discussions do not provide

18

an independent contractual basis for concluding that Jones was obligated to pay a pro rata share out of pocket, and so the trial court correctly granted summary judgment on this claim.

For the reasons stated above, we affirm the trial court's grant of summary judgment to Jones and against the defendants (except Shapiro) on his claim of breach of contract due to the delayed dividend payment and the defendants' breach of contract counterclaim. We remand the remainder of this appeal so that the trial court can enter a stay pending Shapiro's bankruptcy proceedings.

*Judgment affirmed in part and case remanded in part. Mercier and Coomer, JJ., concur.*